# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
|  |  |
|---|---|
| DYSON, INC., | Civil Action No.: |
| Plaintiff, | 09 CV 11745  (WGY) |
| v. | |
| EURO-PRO OPERATING LLC, | **ORAL ARGUMENT AND HEARING REQUESTED** |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND FOR EXPEDITED DISCOVERY


PROSKAUER ROSE LLP
One International Place
22nd Floor
Boston, Massachusetts 02110
617-526-9600
*Attorneys for Plaintiff Dyson, Inc.*


On the Brief:
Steven M. Bauer, BBO #542531
Benjamin M. Stern, BBO#646778

Of Counsel:
Lawrence I. Weinstein, Esq.
Brendan J. O'Rourke, Esq.
(*pro hac vice applications pending*)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

FACTUAL BACKGROUND ...............................................................................3

    Dyson's High-Performing Vacuum Cleaners .....................................................3

    Euro-Pro's Campaign of False Advertising .......................................................5

    Tests Prove The Falsity, Not the Accuracy, of Euro-Pro's "Push and Pull"
        Claim .......................................................................................................8

    Tests Prove the Falsity, Not the Accuracy, of Euro-Pro's "Deep Cleaning"
        Claim .......................................................................................................9

ARGUMENT ....................................................................................................10

I.      DYSON IS ENTITLED TO A PRELIMINARY INJUNCTION ....................................10

    A.      DYSON IS LIKELY TO SUCCEED ON THE MERITS OF ITS
          FALSE ADVERTISING CLAIM ........................................................11

        1.     The Lanham Act Protects Consumers and Fair Competition
              by Providing Relief to Competitors Injured by False
              Advertising .............................................................................11

        2.     Euro-Pro's Claims That Tests Show That The Navigator Is
              "Just as Easy to Push and Pull" as the DC25, and Just as
              Maneuverable, Are False ..........................................................13

        3.     Euro-Pro's Claim That Tests Show That the Shark
              Navigator Provides the "Same Deep Cleaning" as the
              Dyson DC25 Is Literally False .................................................14

        4.     Dyson Is Likely to Succeed on Every Remaining Element
              of Its False Advertising Claim .................................................15

    B.      DYSON HAS DEMONSTRATED IRREPARABLE HARM ............................17

    C.      THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST
          FAVOR DYSON ........................................................................18

II.     THE COURT SHOULD GRANT EXPEDITED DISCOVERY IN
      ADVANCE OF THE PRELIMINARY INJUNCTION HEARING ................................19

CONCLUSION..................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Camel Hair & Cashmere Institute, Inc. v. Associated Dry Goods Corp.*,
  799 F.2d 6 (1st Cir. 1986) .................................................................................................10

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*,
  284 F.3d 302 (1st Cir. 2002) .............................................................................11, 15, 16, 17

*Castrol, Inc. v. Pennzoil Co.*,
  799 F. Supp. 424 (D.N.J. 1992),
  *aff'd*, 987 F.2d 939 (3d Cir. 1993) .....................................................................................17

*Clorox Co. v. Proctor & Gamble Commer. Co.*,
  228 F.3d 24 (1st Cir. 2000) ...................................................................................11, 12, 16

*Coca-Cola Co. P.R. v. Tropicana Prods., Inc.*,
  690 F.2d 312 (2d Cir. 1982) ..................................................................................11, 12, 16

*Coca-Cola Co. v. Procter & Gamble Co.*,
  822 F.2d 28 (6th Cir. 1987) ................................................................................................19

*FTC v. Direct Mktg. Concepts, Inc.*,
  2004 U.S. Dist. LEXIS 11628 (D. Mass. June 23, 2004) ......................................................19

*Gillette Co. v. Norelco Consumer Prods. Co.*,
  946 F. Supp. 115 (D. Mass. 1996) .............................................................................. passim

*Gillette Co. v. Wilkinson Sword, Inc.*,
  1989 U.S. Dist. LEXIS 8276 (S.D.N.Y. July 6, 1989) ..........................................................17

*HipSaver Co. v. J.T. Posey Co.*,
  490 F. Supp. 2d 55 (D. Mass. 2007) ...............................................................................13, 15

*Imig, Inc. v. Electrolux Home Care Prods.*,
  2007 U.S. Dist. LEXIS 20530 (E.D.N.Y. Mar. 22, 2007) ......................................................12

*Johnson & Johnson-Merck Consumer Pharms. v. Procter & Gamble Co.*,
  285 F. Supp. 2d 389 (S.D.N.Y. 2003) ..............................................................................12, 17

*McNeil-PPC, Inc. v. Pfizer Inc.*,
  351 F. Supp. 2d 226 (S.D.N.Y. 2005) ..................................................................................13

*McNeilab, Inc. v. American Home Prods. Corp.*,
  848 F.2d 34 (2d Cir. 1988) .................................................................................................17

*Polar Corp. v. Coca-Cola Co.*,
  871 F. Supp. 1520 (D. Mass. 1994) ..................................................................18

*Removatron Int'l Corp. v. FTC*,
  884 F.2d 1489 (1st Cir. 1989) .......................................................................12

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
  241 F.3d 232 (2d Cir. 2001)............................................................11, 16, 17

*SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck
  Consumer Pharms. Co.*,
  2001 U.S. Dist. LEXIS 7061 (S.D.N.Y. June 1, 2001).........................................12

*Tambrands, Inc. v. Warner-Lambert Co.*,
  673 F. Supp. 1190 (S.D.N.Y. 1987)....................................................................12

*Vidal Sassoon, Inc. v. Bristol-Myers Co.*,
  661 F.2d 272 (2d Cir. 1981)..............................................................................17

*Zeneca, Inc. v. Eli Lilly & Co.*,
  1999 U.S. Dist. LEXIS 10852 (S.D.N.Y. July 15, 1999) .......................................13

**STATUTES**

28 U.S.C. § 1657(a) ..........................................................................................19

Lanham Act § 43(a), 15 U.S.C. § 1125(a) ..........................................................11

Fed. R. Civ. P. 26(d), 1993 Advisory Committee Note...........................................19

**OTHER AUTHORITIES**

American Heritage College Dictionary (3d ed. 1993) ............................................14

A preliminary injunction is necessary to immediately enjoin defendant Euro-Pro Operating LLC ("Euro-Pro") from making the literally false comparative advertising claims that Euro-Pro's Shark Navigator vacuum cleaner is just as maneuverable, just as easy to push and pull, and just as effective in cleaning as plaintiff's Dyson DC25 vacuums. These literally false claims are highly likely to cause Dyson severe and irreparable harm if not immediately enjoined.

## PRELIMINARY STATEMENT

Plaintiff Dyson, Inc. ("Dyson"), markets and sells Dyson brand vacuums, the leading vacuum cleaner brand in the United States. Dyson is the US affiliate of the Dyson group of companies based in the United Kingdom. Although Dyson vacuums were only first introduced in the US in 2002, Dyson became the US market leader by 2005, and continues in that position today, as a result of patented, innovative technology that revolutionized vacuum cleaner performance, handling and durability.

This Lanham Act false advertising case arises from a materially false and deceptive national television and internet advertising campaign, by which Dyson's competitor Euro-Pro seeks to capture Dyson's immense good will by falsely claiming performance parity with Dyson's DC25, at a vastly lower cost. The centerpiece of Euro-Pro's advertising campaign is a television commercial (the "Commercial") featuring two talking vacuum cleaners. One is the Dyson DC25; it speaks with a snooty, pretentious British accent, mocking Dyson's British roots. The other talking vacuum, identified as the Shark Navigator, speaks in a pleasant female voice with an American accent. In the Commercial, the talking Dyson DC25 vacuum pompously boasts about its superior qualities and the talking Shark Navigator then deflates each boast by stating that the Shark Navigator performs just as well as the Dyson product.

When the Dyson DC25 vacuum begins to say in the Commercial that it can "out-maneuver" other vacuums, the Shark Navigator cuts it off, asserting that "independent lab tests

1

proved" that the Navigator is "just as easy to push and pull."  This claim is literally false for at least three reasons.  First, it falsely equates maneuverability with push/pull, and thus claims that independent tests prove the Navigator is as maneuverable as the DC25.  But, as Euro-Pro well knows, maneuverability refers to movement involving changes of direction, whereas push-pull refers to straight line, back and forth movements.  In fact, due to the DC25's patented Dyson Ball™ technology, in which the vacuum rests on a central ball instead of on wheels, the DC25 is far more maneuverable than the Navigator, a standard fixed two-wheeled upright.  Second, the Navigator is not as "easy to push and pull" as the Dyson DC25; in testing by an independent laboratory using an industry standard method of measuring the ease with which a vacuum cleaner can be pushed and pulled, the Dyson DC25 was statistically significantly easier than the Navigator to push and pull on multiple standard carpeted surfaces.  Third, contrary to the Commercial's express "establishment" claim, it is highly unlikely Euro-Pro has any valid scientific testing that, as the Lanham Act requires, establishes with reasonable certainty that the Navigator is at parity with the Dyson DC25 in push/pull ease.  *See* Points I.A.1 and I.A.2, *infra*.

The Commercial's other establishment claim – that tests show the Navigator to deliver the "same deep cleaning" as the DC25 – is also literally false.  Cleaning of dust from surfaces is substantially impacted by a vacuum cleaner's suction power.  The DC25 has much greater suction power than the Navigator; not surprisingly, industry standard tests show that the DC25 picks up statistically significantly more dust than the Navigator on most surfaces.  (Point I.A.3.)

As more fully discussed below, Dyson is also likely to establish each of the remaining elements of a Lanham Act false advertising claim, namely that the false representations are material; tend to deceive a substantial segment of the relevant audience; were made in interstate commerce; and are injuring or will likely injure Dyson.  Here, the fact that the Commercial is the

centerpiece of a massive national advertising campaign, and that the "maneuverability/push-pull" and cleaning parity claims play a prominent role in the Commercial, powerfully demonstrate Euro-Pro's own belief that these claims will influence consumer purchasing decisions. Moreover, irreparable harm is not only presumed, but inevitable when, as here, a competitor uses false comparative advertising to steal the prestige of a named rival brand.  (Point I.B.) Additionally, the balance of hardships weighs heavily against the false advertiser, and the public interest is best served by protecting consumers from misleading advertising.  (Point I.C.)

## FACTUAL BACKGROUND

The relevant facts, summarized below, are set forth in detail in the declarations of Caroline Errington, James Widdowson, Dr. Daniel Ennis and Lawrence Weinstein.

### Dyson's High-Performing Vacuum Cleaners

Dyson vacuum cleaners use patented cyclonic separation technology to spin dust and dirt out of the vacuum cleaner's air current at incredibly high speeds.  As a result, the airflow remains unobstructed, enabling the vacuum to maintain a constant, and very high level of suction.  Declaration of Caroline Errington ("Errington Decl.") ¶ 7.  Consequently, Dyson vacuum cleaners are extraordinarily effective at picking up dust and dirt, and continue to perform at a high level even after years of use.  *Id.* Vacuum cleaners sold under the Dyson brand are known internationally for their exceptional cleaning performance and maneuverability.  *Id.*

During the 1980s and 1990s, the Dyson companies obtained patents for various advancements in vacuum cleaner technology, and introduced their vacuum cleaners commercially in England, where they rapidly became the market leader.  *Id.* ¶ 10.  The first Dyson vacuums were not sold in the US until 2002, but by 2005, Dyson vacuum cleaners had become the largest selling upright vacuums in the US by dollar value of sales.  *Id.*  Today,

Dyson's share of the US market by this measure exceeds 30%, far greater than the next leading brand.  *Id.*

The remarkable commercial success of Dyson vacuums resulted not only from their superior suction and cleaning power, but also from Dyson's relentless striving to improve every aspect of its products.  For instance, beginning with its DC15 model, Dyson introduced its distinctive, patented Dyson Ball™ technology to enhance vacuum cleaner maneuverability.  *Id.* ¶¶ 11-12.  In Dyson Ball™ vacuums, the vacuum rests on, and its motor resides in, a central ball, rather than on wheels.  *Id.* ¶ 11.  In March 2008, Dyson introduced in the US its DC25 model, a more advanced Dyson Ball™ model.  *Id.* ¶ 12.  Unlike traditional upright wheeled vacuums such as the Shark Navigator, Dyson Ball™ vacuums can be maneuvered easily around corners and objects on the floor with a simple twist of the wrist, without the vacuum brush head, which picks up surface dust, losing contact with the surface.  *See* Declaration of James Widdowson ("Widdowson Decl.") ¶¶ 10-12.

Owing to Dyson's enormous investment in its Dyson Ball™ technology and to its exceptional performance, handling and durability, the Dyson DC25 is priced at the high end of the market, with an MSRP of $499.99.  Errington Decl. ¶ 17.  Notwithstanding its price, the DC25 line of vacuums has become the top-selling Dyson line in the US.  *Id.*  The enhanced maneuverability of the DC25 is a significant factor shaping consumer purchasing decisions. Marketing surveys show that at least 25% of DC25 purchasers cite ease of use/maneuverability as a primary reason for buying the vacuum, and that nearly 95% of DC25 purchasers report satisfaction with the model's maneuverability.  *Id.* ¶ 13.  Dyson's superior suction and cleaning power are also enormously important attractions to consumers, with nearly 95% of owners reporting satisfaction with these qualities.  *Id.* ¶ 14.

**Euro-Pro's Campaign of False Advertising**

Euro-Pro sells vacuum cleaners in the US under the brand name Shark.  Recently, Euro-Pro began marketing in the US a new vacuum called the Shark Navigator, which is made in China.  *Id.* ¶¶ 19, 37, Ex. 6.  Euro-Pro's Shark Navigator advertising attempts to persuade consumers that the Navigator delivers the same advances, the same quality of cleaning and the same maneuverability that Dyson's DC25 provides, at less than half the cost of the DC25.  *Id.* ¶ 22.  Euro-Pro began delivering this message in its 30-second Shark Navigator Commercial that has appeared on television throughout the US, including in Massachusetts, and as part of, or shown in conjunction with, Shark Navigator infomercials that have been broadcast on cable and satellite television and have been streamed from Euro-Pro's web site.  *Id.* ¶¶ 23-25; *see id.* Ex. 1 (a video of the 30 second Commercial); Ex. 3 (a video of the 30 minute infomercial); Ex. 4 (a video of a 60 second infomercial); and Ex. 5 (a video of a 2 minute infomercial).  The 30 minute infomercial shows the Commercial four times; the other infomercials show the Commercial once.

Dyson first became aware of the Commercial in July 2009.  *Id.* ¶ 23.  Dyson's outside counsel promptly contacted Euro-Pro.  Declaration of Lawrence Weinstein ("Weinstein Decl."), ¶ 2, Ex. 1.  Euro-Pro's response, through counsel, was to deny that a 30 second Commercial for the Shark Navigator existed. *Id.* ¶ 3, Ex. 2.  Dyson's outside counsel then sent Euro-Pro's counsel a copy of the Commercial and reiterated Dyson's request that Euro-Pro make available the testing identified in the Commercial as the proof of the Commercial's advertising claims.  *Id.* ¶ 4, Ex. 3.  Euro-Pro never responded to Dyson's request for substantiation.  Weinstein Decl. ¶ 5.

The Commercial makes at least three material comparative claims *vis-à-vis* the Dyson DC25, in addition to a price comparison.  The Commercial (1) asserts that the Shark Navigator

has the same "no loss of suction technology" as Dyson vacuums do; (2) equates a vacuum cleaner's "maneuverability" with the ease with which it can be pushed and pulled, and asserts that independent lab tests show that the Shark Navigator is as easy to push and pull as the Dyson DC25; and (3) asserts that independent testing also shows that the Shark Navigator has the same "deep cleaning" efficacy as the DC25.  All three of the above claims are readily apparent from a viewing of the Commercial (Errington Decl. ¶ 26 and Ex. 1), a transcription of which appears below.  There can be no dispute that the object of the Commercial's comparison – and derision – is the Dyson DC25; the Commercial calls out and mocks Dyson by name, shows the DC25 throughout the Commercial and, in superimposed text which is referred to in the advertising industry as a "super," states that the Commercial's price comparison is "based on the Dyson DC25."

The Commercial features two talking vacuum cleaners – a Shark Navigator and a Dyson DC25 – that compare themselves to one another:

> *Dyson: I am the legendary Dyson.*
> *Shark: I'm the new Shark Navigator.*
> *Dyson: I have no loss of suction technology.*
> *Shark:  Hey! Me too!*
> *Dyson:  With my yellow ball, I can out-maneuver…*
> *Shark:  Well actually, independent lab tests proved I'm just as easy to push and pull-*
> *Dyson:  Deep cleaning carpets???*
> *Shark:  Yep.  Same lab tests… same deep cleaning…*
> *Dyson:  I have a five-year warranty!*
> *Shark: Me too.*
> *Dyson: Ah…but I cost nearly $500 dollars.*
> (disclaimer screen text reads: "Based on DC25 retail price")
> *Shark:  Really?  I'm less than $200 dollars.*
> *Dyson: Oh…*

Errington Decl. ¶ 27.  The Commercial gives the Dyson vacuum cleaner a pompous, pretentious British accent, while the Shark machine replies in the perky tones of a friendly American woman, presumably the largest segment of Euro-Pro's target audience.  *Id*. ¶ 28.

Euro-Pro makes all three of its claims in the context of an unabashed attempt to ride Dyson's coattails.  The Euro-Pro 30 minute infomercial shown in conjunction with the Commercial illustrates this.  It credits Dyson with having "solved" the problem of loss of suction that besets traditional bag-and-filter vacuum cleaners, but then presents the Shark Navigator not only as "the first no loss of suction vacuum at a price you can actually afford," but also as "the next generation of no loss of suction technology," as if the Shark Navigator were an improvement over the Dyson DC25.  *Id*. ¶ 29, and Ex. 3.  In short, all of the challenged claims in Euro-Pro's Commercial and infomercials are calculated to enable the Navigator to free-ride on, and benefit from, Dyson's reputation for technological innovation and superior performance.  In fact, though, the Navigator cannot come close to matching the innovation, performance or handling of Dyson vacuums, and in particular the DC25 depicted in the Commercial.

With respect to Euro-Pro's claim that the Navigator is just as easy to maneuver or "push and pull" as Dyson's DC25, the infomercial helps reveal how the Commercial falsely conflates the two distinct qualities of maneuverability and ease of pushing and pulling.  Three separate times in the infomercial (Errington Ex. 3), while the narrator says "look how the Navigator is so agile and easy to maneuver," the Navigator is shown being moved over an S-shaped trail of dust, which it vacuums up.  *Id*. ¶ 33 and Ex. 3.  This is consistent with ordinary usage, in which "maneuver" means changes of direction, rather than merely motion along a straight line.  The importance of a vacuum cleaner's ability to easily change direction – to weave through obstacles like a football running back or a car on a crowded highway – can readily be understood by anyone who has used a vacuum to clean a carpeted surface in a room full of chairs and other furniture.  *See* Errington Decl. ¶ 32.  This is a very different concept than the ease with which a vacuum can be pushed in one direction and then pulled straight back.  Yet the 30 second

Commercial deliberately obscures this difference:  it has the Dyson DC25 begin to boast that it can "out-maneuver" other vacuum cleaners, and then has the Navigator interrupt to reply that "Well actually, independent lab tests proved I'm just as easy to push and pull."  Errington Decl. ¶ 31 and Ex. 1.  Moreover, as shown next, the ease with which a vacuum cleaner can be pushed and pulled is measurable by an industry standard laboratory test, and such testing, recently conducted by an independent laboratory, demonstrates that Euro-Pro's claim is false.

**Tests Prove The Falsity, Not the Accuracy, of Euro-Pro's "Push and Pull" Claim**

Euro-Pro's claim that the Navigator is just as easy to push and pull as the Dyson DC25 is literally false, as demonstrated by independent testing laboratory using an industry standard test.  Intertek, a respected independent testing laboratory, conducted push/pull tests on Dyson DC25 and Shark Navigator vacuum cleaners in September 2009 at the request of Dr. Daniel Ennis, an internationally recognized expert in product testing and statistical analysis, who had been retained by Dyson's outside counsel.  Declaration of Dr. Daniel Ennis ("Ennis Decl.") ¶¶ 8, 10.

Test method F 1409 – 00, promulgated by ASTM International, is an industry standard test for measuring the ease with which a vacuum cleaner can be pushed forward in one direction and then pulled straight backward.  Widdowson Decl. ¶ 25 and Exs. 5-6.  Intertek applied ASTM F 1409 – 00 to determine the amount of force necessary to push and pull the Shark Navigator NV22L and the Dyson DC 25 across four typical carpet types:  level loop, multilevel, plush and shag.  *See* Ennis Decl. ¶¶ 8, 10 and Ex. 2.  The results show that on three of the four carpet types (namely, plush, shag, and multilevel carpets), the Navigator requires substantially more work to push and pull than the Dyson DC 25.  *See* Ennis Decl. ¶ 10 and Ex. 3.  These results demonstrate at a high level of statistical significance that the Dyson DC25 is easier to push and pull than the Shark Navigator on multiple surfaces.  *Id.* ¶ 11.

8

Importantly, Euro-Pro did not limit its push-pull parity claim only to level loop carpets, or in any other way; rather, the Commercial makes a comprehensive claim that Euro-Pro is "just as easy to push and pull."  Indeed, the 30 minute infomercial includes a demonstration of the Shark Navigator's push and pull ease on a surface the infomercial specifically identifies as a "plush carpet."  Errington Ex. 3 at 13:35 time.

Moreover, Euro-Pro's sleight of hand in falsely equating maneuverability with the distinctly different concept of push/pull ease undoubtedly reflects Euro-Pro's own recognition that the Navigator is not as maneuverable – in other words not as capable of quickly and easily changing direction without losing contact with the surface being vacuumed – as the DC25.  In fact, the true innovation of the Dyson Ball™ technology is that, with a simple twist of the wrist, the brush head turns with the ball, allowing even sharp changes of the vacuum's direction without lifting the brush head from the surface.  The Navigator, a traditional wheeled upright vacuum that runs on an axle, cannot readily be turned like the DC25, and typically requires back-and-forth or three point turn maneuvers to move around objects that the DC25 can navigate in a smooth continuous arc.  Widdowson Decl. ¶ 12.  Dyson is prepared to submit specimens of both competing models to the Court at the hearing on this motion (or sooner, if the Court prefers) to demonstrate this basic difference in maneuverability.

**Tests Prove the Falsity, Not the Accuracy, of Euro-Pro's "Deep Cleaning" Claim**

Euro-Pro's claim that tests show that the Navigator provides the "same deep cleaning" as the DC25 also is literally false.  In fact, tests show that the DC25 has superior cleaning power and superior dust pickup performance on most surfaces.  An important measure of a vacuum's cleaning power is the number of air watts it delivers at the point of contact with the surface to be cleaned.  Widdowson Decl. ¶ 14.  Dyson technicians performed industry standard ASTM and

International Electrotechnical Commission ("IEC") tests on Dyson DC25 and Shark Navigator specimens.  The DC25 generated, on average, 236.3 air watts compared to 159.7 air watts for the Navigator in the IEC test, and an average of 220.3 air watts compared to 155.7 air watts for the Navigator in the ASTM test.  *Id.* ¶ 15.  When the tester added a cleaning head (which brings the test closer to measuring the vacuum cleaner's cleaning power in actual use), the DC25 generated an average of 107 air watts, compared to 46.3 air watts for the Navigator.  *Id.* ¶ 16.  In short, the Dyson DC25 is over twice as powerful as the Shark Navigator when used with a cleaning head.  The above results were statistically significant in Dyson's favor at greater than the 99% confidence level.  Ennis Decl. ¶ 12.

Dyson's superiority in suction power translates into superior dust pickup.  Here again, Dyson technicians performed both IEC and ASTM test protocols.  Widdowson Decl. ¶ 17, Exs. 3 and 4.  On all but one surface, the Dyson DC25 picked up a higher percentage of dust than the Navigator (*id.* ¶¶ 19-24), and on most surfaces, the results in the DC25's favor were statistically significant at extremely high confidence levels.  Ennis Decl. ¶¶ 13-14.

## ARGUMENT

## I.    DYSON IS ENTITLED TO A PRELIMINARY INJUNCTION

In the First Circuit, to obtain a preliminary injunction, a plaintiff must demonstrate:

> (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Camel Hair & Cashmere Institute, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986) (remanded for issuance of  preliminary injunction against all defendants but one); *Gillette Co. v. Norelco Consumer Prods. Co.*, 946 F. Supp. 115, 140 (D. Mass. 1996) (issuing injunction).  "[T]he likelihood of success is the most crucial of the requirements for the granting

of an injunction." *Id.* at 120.  As set forth more fully below, Dyson is overwhelmingly likely to succeed on the merits of its false advertising claim; it will suffer irreparable harm if relief is not granted; and the balance of hardships and public interest weigh decidedly in its favor.

**A.    DYSON IS LIKELY TO SUCCEED ON THE MERITS OF ITS FALSE ADVERTISING CLAIM**

**1.    The Lanham Act Protects Consumers and Fair Competition by Providing Relief to Competitors Injured by False Advertising**

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), protects consumers and competitors with a view to "insur[ing] truthfulness in advertising and to eliminate[ing] misrepresentations with reference to the inherent quality or characteristic of another's product." *Coca-Cola Co. P.R. v. Tropicana Prods., Inc.*, 690 F.2d 312, 318 (2d Cir. 1982).  To prove a false advertising claim under the statute, a plaintiff must demonstrate that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 311 (1st Cir. 2002); *see also Clorox Co. v. Proctor & Gamble Commer. Co.*, 228 F.3d 24, 33 n. 6 (1st Cir. 2000).  "A plaintiff can succeed on a false advertising claim by proving either that an advertisement is false on its face or that the advertisement is literally true or ambiguous but likely to mislead and confuse consumers."  *Clorox*, 228 F.3d at 33; *see also S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001).

In determining what messages an advertisement unambiguously conveys, the ad's visual images and context can be as important as the spoken words.  *See, e.g.*, *S.C. Johnson*, 241 F.3d at

238 ("In considering a false advertising claim, 'fundamental to any task of interpretation is the principle that text must yield to context'. . . .  The entire mosaic should be viewed rather than each tile separately.") (citation omitted); *Coca-Cola*, 690 F.2d at 318; *Imig, Inc. v. Electrolux Home Care Prods.*, 2007 U.S. Dist. LEXIS 20530, at *39-40 (E.D.N.Y. Mar. 22, 2007) ("The court's analysis . . . must be conducted with an eye to the overall impression created by the challenged advertising or promotion.").

Here, Euro-Pro's advertisements leave nothing to the imagination.  The Commercial *explicitly states* that "independent lab tests prove [the Shark Navigator] is just as easy to push and pull" and provides the "same deep cleaning" as another vacuum which is specifically identified as and shown to be a Dyson DC25, as a super in the ad confirms.  Errington Decl. ¶ 27 and Ex. 1.  As discussed above, testing shows that these statements are in fact literally false.  The Commercial also makes what in context is a literal claim of test-proven parity with respect to maneuverability, by the artifice of equating maneuverability and push and pull ease and then claiming test-proven push and pull parity.[1]

Additionally, because the Commercial explicitly bases its push and pull and deep cleaning parity claims on the purported results of "independent lab tests," these claims are what are known as "establishment claims."  *See Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1492 n.3 (1st Cir. 1989).  Where, as here, an advertisement makes an establishment claim, the plaintiff

---

[1]      Euro-Pro's advertisements are also surely false by necessary implication.  "A claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated."  *Clorox Co*., 228 F.3d at 35.  A court may deem an advertisement false by necessary implication if it is susceptible to no more than one interpretation, and that interpretation is false.  *Johnson & Johnson-Merck Consumer Pharms. v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 392 (S.D.N.Y. 2003) (finding defendant's advertisements false by necessary implication and granting plaintiff's request for a preliminary injunction); *see, e.g.*, *Tambrands, Inc. v. Warner-Lambert Co.*, 673 F. Supp. 1190, 1194 (S.D.N.Y. 1987).  In "false implication" cases, no reference need be made to consumer reaction and, thus, these case are distinct from cases based on implied falsity, where the claim is literally true but deemed misleading based upon consumer reaction or understanding.  *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 2001 U.S. Dist. LEXIS 7061, at *26 n.14 (S.D.N.Y. June 1, 2001).  Here, it is clear that the audience will recognize the Commercial's message to be that the Shark Navigator is an inexpensive equivalent of the DC25.

can successfully challenge the claim either by offering independent proof of falsity (as Dyson

has done), or by showing that the advertiser's tests either "were not sufficiently reliable" to

support the advertiser's claim, *Gillette,* 946 F. Supp. at 121 (citation omitted), or that the tests,

"even if reliable, do not establish the proposition asserted by the defendant." *HipSaver Co. v.

J.T. Posey Co.*, 490 F. Supp. 2d 55, 67 (D. Mass. 2007) (citations and quotations omitted).  *See

also McNeil-PPC, Inc. v. Pfizer Inc.*, 351 F. Supp. 2d 226, 248 (S.D.N.Y. 2005).  Indeed,

"[g]ood faith performance of tests is not a defense to a challenge of an establishment claim."

*Gillette Co.*, 946 F. Supp. at 122.  Since Euro-Pro's advertising messages with respect both to

"push-and-pull" and cleaning parity are establishment claims, Dyson may prevail by ultimately

demonstrating merely that Euro-Pro's cited studies are either unreliable or do not match the

claims asserted in Euro-Pro's ads.  *See Zeneca, Inc. v. Eli Lilly & Co.*, 1999 U.S. Dist. LEXIS

10852, at *89-90 (S.D.N.Y. July 15, 1999) (granting preliminary injunction).[2]

> **2.     Euro-Pro's Claims That Tests Show The Navigator Is "Just as Easy to
> Push and Pull" as the DC25, and Just as Maneuverable, Are False**

The evidence is overwhelming that Euro-Pro's claim that the Navigator is as easy to

maneuver, or push and pull, as the DC25 is untrue.  First, the claim that tests show that the

Navigator is "just as easy to push and pull" as the DC25 is literally false.  As previously noted,

independent testing applying ASTM standards shows that Dyson's DC25 is easier to push and

pull on three of the four ASTM standard carpets.[3]  Ennis Decl. ¶¶ 10-11.  Of course, these results

---

[2]     Before filing this lawsuit, Dyson asked Euro-Pro for the purported test results referred to in the
Commercial.  Weinstein Dec. ¶¶ 2, 4, and Ex. 1, 3.  Euro-Pro elected not to comply with Dyson's reasonable
request.  *Id*. ¶ 3, 5, and Ex. 2.  There can be nothing confidential about Euro-Pro's testing.  First, the industry
standard test methodology, *i.e.*, ASTM F 1409-00, is well known and public.  Second, Euro-Pro has published its
conclusions by stating openly in interstate commerce that the Shark Navigator is just as easy to push and pull and
provides the same deep cleaning results as Dyson's Ball™ technology models.  Thus, Euro-Pro's refusal to let
Dyson see the test results Euro-Pro has boasted about to millions of Americans is suspect, and expedited discovery
is appropriate to ensure that the testing is obtained in advance of the preliminary injunction hearing.

[3]     As this Court has observed with respect to a different ASTM standard, compliance with ASTM standards is
"strong evidence of the soundness" of a party's "testing methodology."  *HipSaver Co., 490* F. Supp. 2d at 68.

disprove the Euro-Pro Commercial's categorical claim, without differentiating among types of surface, that the Navigator is "just as easy to push and pull" as the Dyson DC25.  Indeed, the infomercial that accompanies the Commercial explicitly states in a super on the screen that the infomercial's supposed demonstration of maneuverability occurs on plush carpet (Errington Ex. 3 at 13:35 time), when the Navigator is in fact statistically significantly less easy than the DC25 to push and pull on that carpet type.  Ennis Decl. ¶ 11.

Similarly, Euro-Pro's claim that the Navigator is at parity with the DC25 in maneuverability is also false.  No "push and pull" test could support Euro-Pro's claim, because pushing and pulling is not the same as maneuvering.  To "maneuver" is defined as to "make a controlled series of changes in movement or direction toward an objective" or to "direct through a series of movements or changes in course."  American Heritage College Dictionary (3d ed. 1993), at 824.  Thus, when the talking Dyson vacuum cleaner starts to say it can "out-maneuver" other vacuum cleaners, and the talking Shark Navigator cuts it off and says tests show that Shark is "just as easy to push and pull," the statement is a non-sequitur, intended to lull the unwary into believing that Euro-Pro's tests (whatever they are) prove that its fixed-wheel vacuum cleaner changes direction as freely as Dyson Ball™ models.  No push-and-pull test could support a "just as maneuverable" claim.  And when the models are compared on a mechanical  basis, the superior maneuverability of Dyson Ball™ technology is manifest.  Widdowson Decl. ¶¶ 10-12.

### 3. Euro-Pro's Claim That Tests Show that the Shark Navigator Provides the "Same Deep Cleaning" as the Dyson DC25 Is Literally False

Euro-Pro's claim that the Navigator provides the "same deep cleaning" as Dyson's DC25 is also literally false.  In fact, testing shows that the DC25 has much more suction power than the Navigator and picks up statistically significantly more dust from most surfaces tested.  First, as noted above at pp. 9-10, the evidence that the Dyson DC25 has much more suction power than

the Navigator is overwhelming.  Suction power is central to a vacuum's cleaning ability, and is strong evidence that the Navigator cannot be equal to the DC25 in cleaning ability.  Moreover, other testing shows that the DC25's super suction power translates directly into superior cleaning results.  *See* Widdowson Decl. ¶¶ 14-23; Ennis Decl. ¶¶ 12-14.

####        4.        Dyson Is Likely to Succeed on Every Remaining Element of Its False Advertising Claim

Dyson is also likely to satisfy the remaining elements of its false advertising claim, by demonstrating that the misrepresentations are material; that they have the tendency to deceive a substantial segment of its audience; that they have been placed in interstate commerce; and that Dyson is likely to be injured as a result of Euro-Pro's false advertisements.

*First*, it is clear that Euro-Pro has misrepresented highly material, inherent qualities of Dyson's vacuum cleaner products – namely, misrepresenting that the Shark Navigator is as easy to maneuver and "push and pull," and provides the same deep cleaning, as the Dyson DC25. "The materiality component of a false advertising claim requires a plaintiff to prove that the defendant's deception is likely to influence the purchasing decision.  One method of establishing materiality involves showing that the false or misleading statement relates to an inherent quality or characteristic of the product."  *HipSaver Co.*, 490 F. Supp. 2d at 67.  *See also Cashmere*, 284 F.3d at 312-13 (holding evidence supported conclusion that advertising falsely presenting the inherent quality of two products as equal was material).  The ease by which a user can maneuver his/her vacuum cleaner is a defining characteristic of the product and highly likely to affect the choice of a substantial percentage of consumers when buying vacuums.  Indeed, maneuverability is, in fact, a significant factor in the purchasing choices and customer satisfaction of DC25 customers.  *See* p. 4, *supra*; Errington Decl. ¶¶ 13, 15.

Likewise, a vacuum's cleaning power is another defining quality that affects consumer choice of vacuum cleaners.  Here again, Dyson's marketing information confirms what common sense suggests.  See p. 4 *supra*; Errington Decl. ¶ 14, 15.  By claiming that the Navigator is at parity with the DC25 in push/pull maneuverability and deep cleaning power, Euro-Pro has misrepresented Dyson's products in a manner that is highly likely to affect consumer purchasing decisions and consumer's opinions about Dyson vacuum cleaners.

*Second*, because the Commercial's push/pull and deep cleaning claims are literally false, the Court must presume they mislead consumers.  Indeed, the First Circuit has held that:

> *we can presume, without reservation, that consumers have been deceived when a defendant has explicitly misrepresented a fact that relates to an inherent quality or characteristic of the article sold.*  To presume as much requires neither a leap of faith nor the creation of any new legal principle.

*Cashmere*, 284 F.3d at 315 (emphasis added).  The standard has been clearly articulated that "[i]f the advertisement is literally false, the court may grant relief without considering evidence of consumer reaction."  *Clorox Co.*, 228 F.3d at 33; *accord, S.C. Johnson*, 241 F.3d at 238; *Coca-Cola*, 690 F.2d at 317.  *Third*, it is undeniable that Euro-Pro has placed the false statement in interstate commerce, since the commercial at issue has been shown extensively across the country on a variety of television channels.  Errington Decl. ¶ 23 and Ex. 2.

*Finally,* Dyson is likely to be injured as a result of Euro-Pro's misrepresentations, "either by direct diversion of sales or by a lessening of goodwill associated with its products."  *Cashmere*, 284 F.3d at 311.  Maneuverability and cleaning power are significant selling points for Dyson, and if customers believe they can obtain an equally powerful and maneuverable vacuum cleaner for less than half the price, Dyson will surely lose significant sales and its reputation for superior quality will be diminished.  Moreover, Dyson and Euro-Pro vacuum cleaners compete directly; both are sold at many of the same major retailers.  Errington Decl.

¶¶ 21, 34.  In sum, Dyson has demonstrated a strong likelihood of success on the merits of its claim.

### B.  DYSON HAS DEMONSTRATED IRREPARABLE HARM

Once a plaintiff in a false advertising case demonstrates a likelihood of success on the merits, irreparable harm is presumed where, as here, the parties' products compete and the challenged ad makes false comparative claims concerning the plaintiff's product.  *See McNeilab, Inc. v. American Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988) (irreparable harm "is presumed" because "[a] misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer").[4]  Moreover, "irreparable harm [is also presumed] where plaintiff demonstrates a likelihood of success in showing literally false defendant's comparative advertisement which mentions plaintiff's product by name."  *S.C. Johnson*, 241 F.3d at 238 (citation omitted).  These presumptions are in accord with settled authority in the First Circuit and elsewhere.  *See, e.g., Cashmere,* 284 F.3d 311 ("a showing that the defendant's activities are likely to cause confusion or to deceive customers is sufficient to warrant injunctive relief") (quotations omitted); *Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 278 (2d Cir. 1981) (false comparisons will "eventually," though not necessarily immediately, "result in loss of sales" for the plaintiff); *Castrol, Inc. v. Pennzoil Co.*, 799 F. Supp. 424, 440 (D.N.J. 1992) (concluding that eventual loss of sales is likely as misleading commercial is repeated), *aff'd*, 987 F.2d 939 (3d Cir. 1993).

As previously noted, the Dyson DC25 and the Shark Navigator compete head-to-head and are sold side-by-side in numerous well-known retail outlets (Errington Decl. ¶ 21), and the

---

[4]      *See also Johnson & Johnson-Merck Consumer Pharms. v. Procter & Gamble Co.*, 285 F Supp. 2d 389, 393 (S.D.N.Y. 2003) ("false comparison ads give rise to a presumption of irreparable injury"); *Gillette Co. v. Wilkinson Sword, Inc.*, 1989 U.S. Dist. LEXIS 8276, at *1-2 (S.D.N.Y. July 6, 1989) (granting injunction in part and noting that "[w]here, as here, the defendants make false comparative advertising claims and the parties are direct competitors, irreparable harm is presumed to result from the continued dissemination of the advertising").

Euro-Pro advertisements make comparative claims by explicitly depicting and calling out the DC25 by name.  In support of its claims, Euro-Pro cites to independent studies and tests, which, to the extent these even exist, are refuted by Dyson's independent industry standard tests.  Thus, the Court should find that Euro-Pro's comparative ads are likely to irreparably harm Dyson.

### C. THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR DYSON

Where a plaintiff has succeeded in establishing literal falsity, the court "need not consider the other factors necessary for the grant of a preliminary injunction" and the plaintiff "is relieved of the obligation to show that its application for injunctive relief meets the standards of irreparability of harm, favorable balance of the hardships of injunctive relief and benign – or at least no malevolent – effect of injunctive relief on the public interest." *Gillette*, 946 F. Supp. at 139.  In any event, the balance of hardships and public interest both weigh in favor of granting the injunction.  There is a "well-settled [proposition] in the First Circuit, that any harm to the defendant from the granting of an injunction is to be discounted by the degree that the plaintiff can show likelihood of success." *Gillette,* 946 F. Supp. at 139.  Dyson is likely to succeed based on its showing that Euro-Pro's parity claims convey false messages about an inherent and material characteristic of Dyson's vacuum cleaners.  Moreover, where, as here, the effect of the injunction is merely to prevent Euro-Pro from continuing its false advertisements, the injunction imposes no hardship on Euro-Pro.  *Polar Corp. v. Coca-Cola Co.*, 871 F. Supp. 1520, 1522 (D. Mass. 1994) (harm to the movant outweighs any injury to advertiser enjoined from misrepresenting the nature of quality of movant's product).

The public policy consideration also weighs in favor of truthful commercial advertising – and therefore a grant of this injunction.  Consumers should not be misled by disparaging false advertising into making uninformed choices about which product to purchase and use.

> As to the question of how the public interest will be affected should an injunction
> issue, all that need be said is that consumers are obviously better served if
> advertisers are made to refrain from misleading them.  The public has a right not
> to be deceived or confused.

*Gillette*, 946 F. Supp. at 139 (citations omitted).  *See also Coca-Cola Co. v. Procter & Gamble Co.*, 822 F.2d 28, 31 (6th Cir. 1987) ("[p]rotecting consumers from false or misleading advertising . . . is an important goal of the [Lanham Act] and a laudable public policy to be served").  Deceptive advertising is never in the public's best interest.

## II.   THE COURT SHOULD GRANT EXPEDITED DISCOVERY IN ADVANCE OF THE PRELIMINARY INJUNCTION HEARING

Dyson also seeks an order granting expedited discovery in advance of the preliminary injunction hearing.  Expedited discovery is especially called for when preliminary injunctive relief is sought.  *See* 28 U.S.C. § 1657(a) ("the court shall expedite the consideration of . . . any action for temporary or preliminary injunctive relief."); Fed. R. Civ. P. 26(d), 1993 Advisory Committee Note (expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction").  Courts routinely invoke their powers to order expedited discovery in false advertising and other Lanham Act cases, as the threat of irreparable harm is at stake and will only deepen over time.  *See, e.g.*, *FTC v. Direct Mktg. Concepts, Inc.*, 2004 U.S. Dist. LEXIS 11628, at *38 (D. Mass. June 23, 2004) (granting expedited discovery in a false advertising injunction action instituted by the FTC).

Expedited discovery imposes no undue hardship on Euro-Pro.  Euro-Pro should have no difficulty proceeding under a reasonable, narrowly tailored discovery schedule.  Moreover, the discovery is clearly necessary because Euro-Pro has refused to share with Dyson important details concerning the development of, and substantiation for, its ad campaign and the "independent lab tests" to which its commercial directly refers.  Delay should be avoided, as it

will only allow Euro-Pro to continue disseminating these false and deceptive advertisements,

causing further harm to both Dyson and the public.

## CONCLUSION

For all of the foregoing reasons, the Court should grant Dyson's motion for a preliminary

injunction, and set a date for an expedited hearing and expedited discovery.

Dated:  October 23, 2009                              Respectfully submitted,

                                                                    By:  ___/s/ Steven M. Bauer___ ___

                                                                              Steven M. Bauer (BBO#542531)
                                                                              Benjamin M. Stern (BBO#646778)
                                                                              PROSKAUER ROSE LLP
                                                                              One International Place
                                                                              22nd Floor
                                                                              Boston, MA  02110
                                                                              Tel.: 617.526.9600
                                                                              Fax.: 617.526.9899
                                                                              Email: sbauer@proskauer.com
                                                                              Email: bstern@proskauer.com
                                                                              *-and-*
                                                                              Lawrence I. Weinstein
                                                                              (*pro hac vice application pending*)
                                                                              Brendan J. O'Rourke
                                                                              (*pro hac vice application pending*)
                                                                              PROSKAUER ROSE LLP
                                                                              1585 Broadway
                                                                              New York, New York 10036
                                                                              Tel.: 212.969.3000
                                                                              Fax.: 212.969.2900
                                                                              Email: lweinstein@proskauer.com
                                                                              Email: borourke@proskauer.com

                                                                              *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Benjamin M. Stern, hereby certify that this document, filed through the ECF system, will be served on Defendant Euro-Pro Operating, LLC, at 1210 Washington Street, Newton, MA 02465, via hand delivery on October 23, 2009.

 */s/ Benjamin M. Stern*
Benjamin M. Stern